# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**WATSON CONSTRUCTION COMPANY
INC., a Florida corporation,**

    **Plaintiff,**

**vs.**         **CASE NO.: 1:05-CV-094-SPM**

**CITY OF GAINESVILLE,
a political subdivision,**

    **Defendant.**

_____/

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

_____**THIS CAUSE** comes before the Court upon the City's countermotion for

summary judgment (doc. 103) and memorandum in support thereof (doc. 104), and

Plaintiff's memorandum in opposition (doc. 114).  For the reasons set forth below, the

Court finds the motion must be denied.

**FACTUAL BACKGROUND**

   The complicated factual history of this case is set out at length in Defendant's

countermotion for summary judgment (doc. 103).  In brief, Yelvington Industries, owned

by Conrad and Gary Yelvington, purchased a 49-acre tract of land in north Gainesville

off of State Road 441.  Plaintiff, Watson Construction Company, approached Yelvington

about possibly buying a portion of the property.  Watson and Yelvington entered into a

contract for sale of 22.37 acres on the eastern side of the 49-acre tract, contingent upon Watson receiving approval from Defendant, the City of Gainesville, to site an asphalt and/or concrete plant on the property.  During a "first-step" meeting[1] with City planning staff, concern was expressed about the number of asphalt plants already in the area, and the idea of instituting a moratorium on this type of development was raised.  The City indicated to Watson representatives that it would not seek a moratorium, but that private citizens would still be free to initiate such proceedings.

On January 18, 2001, Watson attended a "concept review" held by the City's Plan Board, at which a number of citizens appeared and expressed concern about the impact of the proposed asphalt plant.  On February 12, 2001, during a City Commission meeting, more citizens voiced comments about the plant and asked the City to impose a moratorium in order to study the allowable uses in that particular zoning district.  The City agreed and referred the matter to the Community Development Committee to "investigate the feasibility and language of a temporary moratorium with respect to I-2 zoning."  *See* doc. 94, Tsp. App. 1 at 12:9-12.[2]  A motion was passed to refer the issue to the Development Committee "for a special meeting to look into this and try to come up with a moratorium."  *See* doc. 94, Tsp. App. 1 at 15:10-11.  Three days later, on February 15, Watson filed an application for preliminary site plan approval for an

---

[1]  Officially referred to as a pre-application conference in the City's Code of Ordinances.

[2]  Most document and page citations (except for transcripts) refer to the electronic stamp placed at the top of each document by CMECF's electronic filing system, rather than the page number or exhibit number of the document itself.  This was done in order to facilitate precise location of any document among the 800+ exhibits filed with the Court.  Citations to transcripts are denoted by a colon between the page number(s) and line number(s), *e.g.*, page 12, lines 9 through 12 are abbreviated as 12:9-12.

asphalt and concrete batch plant.

Additional meetings were held, research was conducted, and studies were performed.  Finally, upon second reading on May 14, 2001, a six-month moratorium was adopted and imposed, during which time the City would study 48 industrial uses and their impact on the surrounding areas.[3]  A "zoning-in-progress" date of February 12, 2001 was established after which no applications would be accepted.

Watson and Yelvington then filed complaints and motions for injunctive relief in state court.  Upon hearing, the judge granted Watson's motion and enjoined the City from enforcing the moratorium as to Watson.  The City took an interlocutory appeal to the First District Court of Appeal of Florida, which affirmed on the merits but remanded the case to enable the trial court to require Watson to post a bond.

Watson now sues the City of Gainesville seeking monetary damages under a number of theories, including due process and equal protection violations, as well as takings claims.  The City has moved for summary judgment, and each ground is examined in turn.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The moving party bears the initial burden, under Rule 56, of showing the court that there are

---

[3]  The moratorium ended on December 16, 2001.

no genuine issues of material fact to be decided at trial.  Jeffery v. Sarasota White Sox, Inc., 64 F. 3d 590, 593 (11th Cir. 1995); *see also* Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  If a moving party discharges its burden by pointing out an absence of evidence to support a necessary part of a claim, "the non-moving party must then 'go beyond the pleadings' and by its own affidavits, or by 'depositions, answers, to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  Id. at 594 (*quoting* Celotex, 477 U.S. at 324).

The court must view the evidence in the light most favorable to the non-movant, resolving all reasonable doubt in that party's favor.  Id.  Thus, if a reasonable fact finder could draw more than one inference to support a genuine issue of material fact, the court should not grant summary judgment. Id.   An issue of material fact is genuine if the "evidence is such that a reasonable jury could return a verdict for a nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Id. (*quoting* First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-289 (1968)).


**LEGAL ANALYSIS:**

## **Standing and Property Interest**

A crucial element of Watson's claims—due process, equal protection, and takings—requires that the plaintiff have some type of protectable property interest that has been infringed upon or abridged in some fashion.  Without a finding that Watson

had a property interest at stake, standing does not exist, and the case must be

dismissed.

The elements of standing laid out by the United States Supreme Court in Lujan

v. Defenders of Wildlife, 504 U.S. 555 (1992) were summarized by the Eleventh Circuit

as follows:

> To satisfy the constitutional requirements of standing, a plaintiff must
> make three showings:  First, the plaintiff must have suffered an "injury in
> fact"—an invasion of a legally protected interest which is (a) concrete and
> particularized, and (b) "actual or imminent, not 'conjectural' or
> 'hypothetical.'"  Second, there must be a causal connection between the
> injury and the conduct complained of—the injury has to be "fairly . . .
> trace[able] to the challenged action of the defendant, and not . . . th[e]
> result [of] the independent action of some third party not before the court."
> Third, it must be "likely," as opposed to merely "speculative," that the
> injury will be "redressed by a favorable decision."

Dillard v. Baldwin County Comm'rs, 225 F.3d 1271, 1275 (11th Cir. 2000)(alterations in

original).  Standing is unavailable to a plaintiff "unless the right invaded is a legal

right—one of property, one arising out of a contract, one protected against tortious

invasion, or one founded on a statute which confers a privilege."  Tennessee Elec.

Power Co. v. Tennessee Valley Auth., 306 U.S. 118, 137-38 (1939).

The City argues that the contract for sale between Yelvington and Watson was

specifically for the eastern 22.37 acres of the 49-acre tract owned by Yelvington.  The

site plan submitted to the City by Watson showed the proposed plant sitting on 5 acres

west of the 22.37 subject acres.  Because Watson submitted plans on land it did not

own, the City claims that Watson has no cognizable property right to protect.

In response, Watson cites to a letter from Yelvington authorizing Watson "to do

and perform any act whatsoever requisite and necessary to obtain those development

approvals for the property as described by . . . Exhibit A." *See* doc. 96 App. Exh. 180.

Exhibit A contains a legal description of the entire 49 acres which, Watson argues,

demonstrates that it was not limited to the 22.37 acres described in the contract.  To the

contrary, Watson claims that the decision was deliberately made to use the entire 49-

acre parcel's legal description as the site plan location.  As Gary Yelvington noted in his

affidavit, this would prevent delay in the event Watson's engineers had to shift the site's

layout to accommodate regulations or unforeseen City requests. *See* doc. 121, att. 14

at 2, ¶ 9.  Accordingly, Watson was given authorization to build anywhere on the 49

acres, with the expectation that the final closing documents would use an amended

description of the land actually utilized. *See* doc. 121, att. 14 at 2, ¶ 9.  Watson

submitted multiple site plans to the City, some of which utilized property outside of the

22.37 acres. *See* doc. 121, att. 14 at 2, ¶ 10.  Each plan was submitted with

Yelvington's full knowledge and consent. *See* doc. 121, att. 14 at 2, ¶ 10.  Additionally,

Yelvington testified that he specifically bought the 49 acres with the expectation of

selling or leasing part of it in order to offset the costs of purchase. *See* doc. 93, att. 26

at 13:9-19; 20:1-6; doc. 121, att. 14 at 6, ¶ 7.

Watson had been planning since the inception of the contract to build an asphalt

and concrete plant on the Yelvington site; in fact, it was because of this contract that

Yelvington closed on the purchase of the entire 49 acres from Nekoosa, the original

owner of the parcel. *See* doc. 121, att. 14 at 6, ¶ 6.  At that time, both the asphalt and

concrete plants were uses by right; no special permits were required to build, and

Watson anticipated no problems with the construction.

Watson spent over $200,000 to purchase, disassemble, and move an existing plant to the new site, and expended more than $100,000 in preparing its plans, including engineering, designing, legal work, and various application fees. *See* doc. 60 at 2-3.

Watson representatives met with the City on multiple occasions for first-step meetings, concept review meetings, and other private meetings. Based on the City's suggestions and recommendations, Watson went back and revised its plans and designs, expending additional time and money to appease any concerns the City might have.

Watson claims that the City's passage of the moratorium caused Watson to lose its purchase contract with Yelvington. The original contract between Watson and Yelvington provided that the contract would expire 45 days after Yelvington's final site plan approval if Watson failed to file its application. *See* doc. 95, App. Ex. 5 at 1, ¶ E. Yelvington agreed to extend this date two or three times to permit Watson to pursue its site application with the City, but the contract still expired while the moratorium was in place. After the moratorium expired, a competitor built an asphalt plant on the very site for which Watson had been trying to obtain approval, thus depriving Watson of any opportunity to construct its plant there.

Examining the allegations in context, a conclusion could be drawn that because Watson was authorized to site the plant anywhere on the 49 acres, it had a property interest in the 5 acres on which the proposed plant was sited. While the right is certainly debatable, a property interest is assumed for the purposes of this order.

# CONSTITUTIONAL ISSUES

### *I: Confusion Abounds*

Land-use litigation is a complex area of law, to say the least.  It involves
constitutional issues such as those raised by Watson in the instant case: due process
(both substantive and procedural), equal protection, and takings, among others.  There
is considerable overlap in some of these constitutional concepts, and the United States
Supreme Court has adjusted and refined its understanding of these concepts
throughout the years, at times overturning or otherwise modifying its earlier decisions.
As an example of the confusion engendered by this area of the law, consider that the
"arbitrary and capricious" standard is used in analyzing both a procedural due process
claim and an equal protection claim, Eide v. Sarasota County, 908 F.2d 716, 722 (11th
Cir. 1990), but that such standard is only proper for an as-applied due process claim,
not a facial challenge.  *See* id. at 724 n.12.  Even so, the arbitrary and capricious
standard only applies to equal protection claims that do not target a protected class;
otherwise, a strict scrutiny standard applies.  WCI Cmty, Inc. v. Coral Springs, 885 So.
2d 912, 914 (Fla. 4th DCA 2004).  Consider also that property rights are entitled to only
procedural due process, Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 229
(1985), unless those rights have been infringed by legislative act.  In that case, a
plaintiff loses his right to procedural due process and is entitled instead to substantive
due process. Lewis v. Brown, 409 F.3d 1271, 1273 (11th Cir. 2005); 75 Acres, LLC v.
Miami-Dade County, 338 F.3d 1288, 1294 (11th Cir. 2003).

Due process has been incarnated in various formats and has spawned

"variations" such as due process takings and arbitrary and capricious due process. Eide, 908 F.2d at 721-22.  Additionally, just compensation and takings claims involving due process have now been subsumed under the just compensation clause of the Constitution.  Villas of Lake Jackson, Ltd. v. Leon County, 121 F.3d 610, 612 (11th Cir. 1997).  There is discussion about ripeness; some due process violations are complete when the governmental action is taken, while others require the plaintiff to avail himself of available state remedies.  McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994). On the other hand, some courts recognize a "futility" defense and except the plaintiff from attempting to take advantage of those available remedies.  Palazzolo v. Rhode Island, 533 U.S. 606, 625-26 (2001).

To add to the difficulty, the Eleventh Circuit itself, over time, has altered its understanding of the applicable rule of law.  It acknowledged the similarity between the tests for substantive due process and takings claims.  *See* Rymer v. Douglas County, 764 F.2d 796, 802 (11th Cir. 1985)("We note, at the outset of this analysis, the similarity in this case between [the substantive due process] test and the inquiry we made pursuant to the taking clause of the Fifth Amendment . . . .  The due process test enunciated in Williams adds little or nothing that the taking clause does not encompass").  It noted the alternate test for meeting the arbitrary and capricious standard.  *See* McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994)("An alternate substantive due process test finds a violation if the questioned governmental action 'shocks the conscience' of federal judges").  The McKinney court went on to say that this test, however, "has no place in a civil case for money damages."  Id. n.7.

<u>McKinney</u>'s importance also lies in the fact that it virtually negated much of the court's earlier precedent.  *See* <u>Greenbriar Village, LLC. v. Mountain Brook</u>, 345 F.3d 1258, 1263 (11th Cir. 2003)("Our own research into the area reveals that many of the cases cited by [appellant] are flagged as being cast into doubt or impliedly overruled by <u>McKinney</u>").[4]

The Eleventh Circuit has also pointed out tension between its holdings and those of the United States Supreme Court.  *See* <u>Reahard v. Lee County</u>, 30 F.3d 1412, 1417 n.12 ("Two special concurrences in [an earlier case] indicate some tension between this circuit's precedent . . . and [a United States Supreme Court decision]").  And finally, the court has admitted, "This court has itself confused due process takings and arbitrary and capricious due process claims."  <u>Eide v. Sarasota County</u>, 908 F.2d 716, 722 (11th Cir. 1990).

Even learned judges in our own district must struggle with creating some semblance of logic out of convoluted legal "distinctions."   In <u>Villas of Lake Jackson, Ltd. v. Leon County</u>, 906 F. Supp. 1509 (N.D. Fla. 1995), Judge William Sherrill, upon rehearing, authored a 25-page opinion retracing the metamorphoses of due process.  Particularly telling of the complexity is Judge Sherrill's comparison by analogy of just compensation and due process takings:

> In short, if the result of attempting to cross a Fifth Amendment just compensation claim with a due process claim is some sort of due process claim, as was found in <u>Eide</u>, the "taking" gene of the hybrid fails. A due

---

[4] Indeed, the court in <u>Greenbriar Village</u> commented, "All of the Eleventh Circuit precedent cited by the parties on these types of substantive due process claims mysteriously ends in 1994, which, curiously, is the same year that an *en banc* court decided <u>McKinney</u>.  345 F.3d at 1263 n.4.

process takings claim has no justification independent of normal due process principles. The better approach would be to find, and the court so rules, that a due process takings claim is a substantive due process claim. Count III [due process taking], therefore, is nothing more than Count II [arbitrary and capricious substantive due process] restated. Thus, the court's ruling upon summary judgment as to Count II applies with equal force to Count III.

Id. at 1516.

In an attempt to comprehensively address all constitutional issues raised in the various summary judgment motions, following is a general discussion of due process, equal protection, and takings claims.


## II: Sorting It Out

We begin with the premise that the Fourteenth Amendment made rights guaranteed by the United States Constitution applicable to the states.  It is possible, then, that a state's infringement of those rights could rise to the level of a federal violation.  While 42 U.S.C. § 1983 was created to provide a cause of action for such cases, not every state violation rises to the level of invading a federally-protected right. Rymer v. Douglas County, 764 F.2d 796, 800 (11th Cir. 1985).

Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, [or] regulation . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In Monell v. New York City Dep't of Social Servs, 436 U.S. 658 (1978), the United

States Supreme Court held that Congress intended for municipalities and other local government entities to be included in the § 1983 definition of "person". Id. at 690. At the same time, the Court made it clear that municipalities may not be held liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. at 691. Watson alleges, *inter alia*, that the City of Gainesville violated Watson's constitutional due process rights under § 1983.

Two types of due process exist: substantive and procedural. McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994). A violation of either is cognizable under section 1983. Id. The trick lies in clearly distinguishing the two and then delineating other claims that are sometimes mistakenly labeled as due process.

Substantive due process protects "a general right of an individual to be free from the abuse of governmental power . . . ." Rymer, 764 F.2d at 802 n.4. Such rights are protected against "'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)(*quoting* Daniels v. Williams, 474 U.S. 327, 331 (1986)). Consequently, substantive due process protections are afforded only to fundamental rights and liberties—those arising under the United States Constitution. Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997). The entitlement to procedural due process, on the other hand, arises from "the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972).

Certain features distinguish one type from the other. As mentioned *supra*,

substantive due process rights are protected "against certain government actions regardless of the fairness of the procedures used to implement them."  In contrast, procedural due process does not protect against the *deprivation* of rights; it only protects against an unfair *process* when depriving an individual of those  rights.  <u>Carey v. Piphus</u>, 435 U.S. 247, 259 (1978).

Another distinction between the two is the time at which the violation is said to have occurred.  Substantive due process violations are complete at the moment the wrongful action occurs (because there is no amount of subsequent due process that could cure the violation), while procedural due process violations ordinarily are not considered complete "unless and until the state fails to provide due process." <u>McKinney v. Pate</u>, 20 F.3d 1550, 1557 (11th Cir. 1994).  In other words, "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide [that remedy] does a constitutional violation actionable under section 1983 arise."  <u>Id.</u>

A final distinction between the two is the remedy available to a plaintiff whose rights have been violated.  A substantive due process violation is cured by legal damages, *i.e.*, compensation for the value of the deprived right.  <u>Id.</u> at 1557. Procedural due process remedies include equitable damages, such as invalidation of an ordinance or an injunction prohibiting its application.  <u>Id.</u>

It is at this point that things unravel.  Some courts in the past had created a type of due process specifically related to the taking of private property by the government instead of simply relying on the just compensation clause of the federal Constitution.

The Eleventh Circuit, in <u>Eide v. Sarasota County</u>, 908 F.2d 716 (11th Cir. 1990),

identified four discrete types of challenges a landowner could bring against the state: 1)

just compensation claims; 2) due process takings claims; 3) arbitrary and capricious

due process claims; and 4) equal protection claims.  <u>Id.</u> at 720.

The first two types are similar; a just compensation claim alleges that a

regulation on its face has "gone too far," thus demonstrating a taking of the property,

while a due process takings claim alleges that the application of that regulation has

"destroyed the value of the property to such an extent that it has the same effect as a

taking by eminent domain."  <u>Id.</u> at 721.  The main difference between the two was the

remedy available: a just compensation claim warranted monetary damages, while a due

process takings claim would result in "an invalidation of the local authority's application

of the regulation, and, perhaps, actual damages."  <u>Id.</u> (citations omitted).  <u>Eide</u> noted

that the distinction between the first two types "may be academic if the Supreme Court

decides that a non-physical 'taking' claim is properly redressed by only the Just

Compensation Clause or only the Due Process Clause."  <u>Id.</u> at 721 n.8.

Skipping to the fourth type, an equal protection claim is relatively straightforward.

It arises when a plaintiff claims either that the land-use regulation targets a protected

class or that it simply treats the plaintiff differently from others similarly situated.  <u>Id.</u> at

722.  Depending on which allegation is made, the regulation is subject to strict scrutiny

or a rational basis test, respectively.[5]

---

[5] An equal protection challenge can also be facial or as-applied, the distinction again
being the remedy available.  The facial remedy enjoins the local authority from enforcing the
regulation, while the as-applied remedy enjoins the authority from applying the regulation to that
particular plaintiff.  <u>Id.</u> at 722.

It is the third type of claim which engenders confusion.  Eide relabeled the substantive due process claim with the new moniker "arbitrary and capricious due process claim".  The rationale for doing so, said the Eide court, was that the substantive due process terminology "has contributed to the confusion between an arbitrary and capricious due process claim and a due process takings claim."  Id. at 721-722 n.9.

Later, in Villas of Lake Jackson, Ltd. v. Leon County, 121 F.3d 610 (11th Cir. 1997), the same court concluded that two United States Supreme Court cases, First English Lutheran Evangelical Church v. Los Angeles County, 482 U.S. 304 (1987) and Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), refuted the notion of due process as an independent ground, stating that the cases, when read together, "firmly place all the constitutional constraints on regulatory takings recognized by this Court under the Takings Clause alone."  Id. at 613.  The Villas court definitively stated, "There is no independent 'substantive due process taking' cause of action.  The only substantive due process claim is for arbitrary and capricious conduct."  Id. at 612.

Recognizing that it had abandoned any distinction between takings claims and a due process takings theory (citing Corn v. City of Lauderdale Lakes, 95 F.3d 1066 (11th Cir. 1996) and Bickerstaff Clay Products Co. v. Harris County, 89 F.3d 1481 (11th Cir. 1996)), the Villas court, in its conclusion, clarified the current state of the law, at least in the Eleventh Circuit:

> Any constitutional right based upon a zoning regulation governing a
> specific use of real property, to the extent the claim is based upon the
> deprivation of the right to use the property itself for that specific purpose,
> is protectable, if it is a right for which the Constitution gives protection at
> all, by only these causes of action:

1.      A procedural due process claim challenging the
        procedures by which the regulation was adopted.

2.      A substantive due process claim based upon the
        arbitrary and capricious action of the government in
        adopting the regulation.

3.      A Takings Clause claim which may seek not only just
        compensation, if the regulation amounts to a taking,
        but may seek invalidation and injunctive relief if the
        regulation exceeds what the government body may
        do under the Takings Clause of the Constitution.

4.      Claims under some other constitutional provision that give
        the landowner a protectable right, not specifically involved
        with the real property right itself.[6]

Id. at 615.

        Watson raises all of these claims in its complaint, and each one is now examined

in depth, though not addressed in the order they appear in the complaint.


## COUNT III: PROCEDURAL DUE PROCESS

        Rights regarding land use and zoning restrictions, such as those at issue here,

are created by state law.  Lewis v. Brown, 409 F.3d 1271, 1273 (11th Cir. 2005)(*citing*

Greenbriar Village, LLC v. Mountain Brook, 345 F.3d 1258, 1262 (11th Cir. 2003)).

These property rights, derived from state law, are normally entitled only to procedural

due process protection.  Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 229

(1985).  An exception arises when an individual's state-created right is infringed by

legislative act.  Lewis, 409 F.3d at 1273.  In such a case, a plaintiff is not entitled to

---

[6] Watson's equal protection claim would fall under the fourth type.

procedural due process claim, but is instead entitled to substantive due process.

When government action is legislative in nature, "property owners generally are not entitled to procedural due process." 75 Acres, LLC v. Miami-Dade County, 338 F.3d 1288, 1294 (11th Cir. 2003).  This is so because the persons affected by the legislative act "'have all received procedural due process––the legislative process.   The challenges to such laws must be based on their substantive compatibility with constitutional guarantees.'"  Id. (quoting ROTUNDA, RONALD E. & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW § 17.8 (3d ed. 1999)).  This distinction between legislative and non-legislative acts has been recognized and applied in other Eleventh Circuit cases.  Id. (citing Peterman v. Coleman, 764 F.2d 1416, 1419 (11th Cir. 1985); Couf v. DeBlaker, 652 F.2d 585, 590 (5th Cir. Unit B 1981);[7] South Gwinnett Venture v. Pruitt, 491 F.2d 5, 7 (5th Cir. 1974)).

There is no question that the City's action in passing a moratorium ordinance constitutes a legislative act.  "The enactment of an ordinance by a municipality is an exercise by an agency of its legislative function."  City of Pompano Beach v. Yardarm Restaurant, Inc., 509 So. 2d 1295, 1297 (Fla. 4th DCA 1987).  The City Commission acknowledges the legislative nature of its actions.  See doc. 94, att.1, Tsp. App. 1 at 23-24 (the City Attorney states that "passing a moratorium is a legislative matter").  Because passage of the moratorium is a legislative act that does not implicate the procedural due process protections of the Fourteenth Amendment, Watson can prove

---

[7]  Decisions of the Fifth Circuit rendered before October 1, 1981 constitute binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

no set of facts in support of its procedural due process claim that would entitle it to relief.  Summary judgment must be granted on Count III.


### COUNTS I & II: SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION

In Count I, Plaintiff alleges a substantive due process violation under 42 U.S.C. § 1983, claiming that Defendant's actions were "irrational, an abuse of governmental power, and tainted by improper motive, including partisan, political or personal reasons . . . ."  *See* doc. 1-1 at 29, ¶ 145.  In Count II, Watson alleges equal protection violations, complaining that the City approved plans of other developers while continuing to deny Watson's applications.  Because both constitutional claims utilize the same rational basis test, *see* Eide v. Sarasota County, 908 F.2d 716, 722 (11th Cir. 1990), they are analyzed here under a single heading.

When the legislation being challenged does not target a protected class (and neither party here argues to the contrary), a rational basis standard is utilized:

> The first step in determining whether legislation survives the rational basis test is identifying a legitimate government purpose which the governing body could have been pursuing.  The second step of the rational basis test asks whether a rational basis exists for the enacting government body to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the existence of a conceivably rational basis, not whether that basis is actually considered by the legislative body.  The rational basis standard is highly deferential.

> A court should not set aside the determination of public officers in land use matters unless it is clear that their action has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.

WCI Cmty., Inc. v. City of Coral Springs, 885 So. 2d 912, 914 (Fla. 4th DCA 2004).

Here, the "legitimate governmental purpose" of the moratorium ordinance is "to enable the City of Gainesville sufficient time to review, study, hold public hearings, and prepare and adopt an amendment or amendments to the City of Gainesville Code of Ordinances, including the Land Development Code, relating to the allowance or development of certain manufacturing uses . . . ." *See* doc. 1, att. 1, exh. D at 3:5-8.  A broader purpose, the ordinance notes, is "to fulfill the City's constitutional charge and statutory obligation to protect and preserve the environment and the public health, welfare and safety of the citizens of the City of Gainesville . . . ." *See* doc. 1, att. 1, exh. D at 3:17-19.  The ordinance specifically states that the City has received evidence and heard concerns from professional planning staff that "certain uses within the I-1 and I-2 [limited industrial and general industrial] districts may cause harm to the environment through undesirable air, odor, toxins, and noise emissions and otherwise be incompatible with surrounding land uses . . . ," *see* doc. 1, att. 1, exh. D at 2:10-13, and it is this evidence that prompted the action taken by the City.  All of these statements evince clear and legitimate governmental purposes.

As to whether the action taken would further the stated governmental purpose, moratoria are important planning tools which preserve the status quo to ensure that problems are not created or exacerbated while finalizing a more permanent development strategy.  Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 337 (2002).  Such moratoria satisfy a legitimate governmental purpose.  WCI Cmty., Inc., 885 So. 2d at 916; Bradfordville Phipps Ltd. P'ship v. Leon County, 804 So. 2d 464 (Fla. 1st DCA 2001).  The moratorium would fulfill the City's

goal of protecting the "value, use and enjoyment of property in the City of Gainesville

during the interim period described in [the] Ordinance . . . ."  *See* doc. 1, att. 1, exh. D at

29.  The six-month moratorium period would give the City "sufficient time to review,

study, hold public hearings, and prepare and adopt an amendment or amendments to

the . . . Code of Ordinances . . . relating to the allowance or development of certain

manufacturing uses . . . within the 'I-1: Limited industrial district' and the 'I-2: General

industrial district' in the City of Gainesville."  *See* doc. 1, att. 1, exh. D at 29.  As such,

there was a rational nexus between the City's conduct and the objectives it hoped to

achieve.

    Under the governing rational basis test, the City has shown a legitimate

governmental purpose, and has demonstrated that its purpose was furthered by the

adoption of the moratorium.  The Court cannot find in these facts that the City's actions

had no foundation in reason or that they were an arbitrary exercise of power having no

rational relationship to public health, safety, or welfare.  As such, summary judgment

should be granted as to Counts I and II.


## COUNT IV: FLORIDA STATUTES SECTION 166.041

    Count IV alleges a violation of Florida Statutes section 166.041, which sets out

the requirements that must be followed by a municipality when enacting ordinances.

Watson focuses on the following portion of the statute:  "All ordinances or resolutions

passed by the governing body shall become effective 10 days after passage or as

otherwise provided therein."  Watson complains that "[t]he City Commission at hearing

established a retroactive effective date for [the ordinance]," and that "[a]ccordingly, [the ordinance] is void *ab initio*."  *See* doc. 1-1 at 38, ¶¶ 179, 182.

The "retroactivity" Watson refers to is not the date the ordinance becomes effective, but rather the cutoff "zoning-in-progress" date after which no applications for development would be accepted.  Zoning-in-progress dates are not contemplated by the statute, which applies solely to the date on which the ordinance itself actually takes effect.

Here, the ordinance was adopted on May 14, 2001 and, by its terms, became effective immediately, as permitted by the statute.[8]  *See* doc. 1, att. 1, exh. D at 8:6. Florida Statutes section 166.041 is simply inapplicable to Watson's argument about the zoning-in-progress date.  Any argument Watson has about the City's selection of February 12, 2001 as the cutoff date is simply not cognizable under section 166.041. Summary judgment must be granted as to Count IV.

## COUNTS VI & VII: FACIAL AND AS-APPLIED TAKINGS CLAIMS

Counts VI and VII allege that the moratorium denied Watson all viable economic use of its property, thereby amounting to a taking of the land by inverse condemnation. The term "inverse condemnation" refers to the process by which a landowner recovers damages from a governmental taking of his property, even though no formal takings or condemnation proceedings have been instituted.  United States v. Clarke, 445 U.S.

---

[8]  Note that even if the effective date were invalid, the ordinance itself is not necessarily void.  B.M.Z. Corp. v. City of Oakland Park, 415 So. 2d 735, 736 (Fla. 4th DCA 1982).

253, 257 (1983).  It has been described thusly:

> Inverse condemnation, or a proceeding in the nature of such, is a remedy
> generally available to one whose land has been taken for public use.  A
> claim for inverse condemnation derives from the self-executing character
> of the just compensation clause of the Federal Constitution's Fifth
> Amendment and of comparable state constitutional provisions; of its own
> force, the Federal Constitution furnishes a basis for a court to award
> money damages against the government for an interference with property
> rights which amounts to a taking.

7 Fed. Proc., L. Ed. § 14:229 (citations omitted).

Even a temporary taking warrants just compensation.  First English Evangelical

Lutheran Church of Glendale v. Los Angeles County, 482 U.S. 304, 318 (1987).

However, it has not been expressly decided whether the imposition of a temporary

moratorium constitutes a taking.  Corn v. City of Lauderdale Lakes, 95 F.3d at 1073 n.4.

Instead, the Supreme Court has held that, just as with other deprivations of property

rights, whether a temporary moratorium constitutes a taking "depends upon the

particular circumstances of the case."  Tahoe-Sierra, 535 U.S. at 321.

Watson claims both a facial taking and an as-applied taking.  The distinction

between a facial challenge and an as-applied challenge is as follows:

> In a facial takings claim, the landowner maintains that the mere
> enactment of the regulation constitutes a taking of all affected property
> without adequate procedures to provide prompt, just compensation.  In an
> as-applied claim, the landowner challenges the regulation in the context of
> a concrete controversy specifically regarding the impact of the regulation
> on a particular parcel of property.

Taylor v. Village of North Palm Beach, 659 So. 2d 1167, 1170-71 (Fla. 4th DCA 1995).

Where a plaintiff seeks to vindicate his own rights, the challenge is an as-applied one.

Jacobs v. The Florida Bar, 50 F.3d 901, 906 (11th Cir. 1995).

The only distinction the complaint makes between the two takings claims is that the as-applied claim alleges that Watson "had a reasonable investment-backed expectation of obtaining permits or approvals to build an asphalt plant and concrete batch plant on its property, and of deriving income from that investment." *See* doc. 1-2 at 5, ¶ 208. The Court is not bound by Watson's designation of its claims. Instead, the Court's responsibility is to "examine [the plaintiff's] cause of action for what it actually is, not for what [the plaintiff] would have it be." McKinney, 20 F.3d at 1560. Because both of Watson's takings claims allege that it was deprived of economically viable uses of its land, and that it was deprived of income from its investment, both counts actually raise an as-applied challenge.

In either case, the claim is unripe.[9] As ripeness "goes to whether the district court ha[s] subject matter jurisdiction," it can be raised *sua sponte*. Greenbriar, 881 F.2d at 1574 n.7.

A takings claim is not ripe until two hurdles have been overcome: finality and exhaustion. The two concepts are distinct:

> [T]he **finality** requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the **exhaustion** requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found

---

[9] Taylor v. Village of North Palm Beach, 659 So. 2d 1167 (Fla. 4th DCA 1995), explained that "based on Supreme Court precedent[,] the ripeness doctrine has generally not been applied to facial challenges," id. at 1172 n.3, but observed that "one Florida case has applied the ripeness doctrine to a facial just compensation challenge." Id. (*citing to* Estate of Tippett v. City of Miami, 645 So. 2d 533 (Fla. 3d DCA 1994)). The ripeness requirement understandably does not apply to facial takings because "the mere enactment of the regulation constitutes the taking of all economic value to the land." Lost Tree Village Corp. v. City of Vero Beach, 838 So. 2d 561, 571 (Fla. 4th DCA 2002).

to be unlawful or otherwise inappropriate.

Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 193

(1985)(emphasis added).  Both finality and exhaustion must be demonstrated in order

for a takings claim to be ripe.

**Finality**

The finality requirement arises from the premise that inverse condemnation

seeks redress for a zoning restriction that "goes too far," in effect becoming a taking.  It

is impossible to determine whether such a restriction has in fact "gone too far" until a

final decision has been made by the governmental entity as to the allowable use of the

land at issue.  Williamson County, 473 U.S. at 185.

The Eleventh Circuit has never definitively reached the issue of what constitutes

a final decision,[10] but has accepted the basic premise that "[i]n most cases, no 'final

decision' has been reached until an aggrieved landowner has applied for at least one

variance to a contested zoning ordinance."  Reahard, 30 F.3d at 1415 (*citing*

Williamson County, 473 U.S. at 186).  *See also* Greenbriar, 881 F.2d at 1574 (citations

omitted).

Here, Watson chose not to pursue the available hardship exemption offered by

the moratorium ordinance because of its belief that an exemption would never be

approved.  Watson stated in its complaint that it "did not qualify for any of the

---

[10]  *See* Eide, 908 F.2d at 727 (holding that under the facts presented, the court "need not decide in this case whether to adopt the per se requirement in the Seventh and Ninth Circuits that at least one meaningful application be submitted to the local zoning authority before an as-applied claim is ripe for adjudication").

exemptions or hardship provisions of the moratorium as set forth in Sections 4 or 5 of the moratorium ordinance."  *See* doc. 1-2 at 43, ¶ 204.  Watson goes on to argue that "[t]here were no other provisions of the City's comprehensive plan or land development code that would have allowed Watson to evade the moratorium.  Watson's applications for development were recommended for denial, deferred indefinitely, not heard, or, as in the case of the hardship variance application, struck from the agenda."  *See* doc. 1-2 at 44, ¶ 204.[11]

While the futility exception does not require a landowner to submit variance applications for their own sake, it does require him to follow "reasonable and necessary" steps to permit the land-use authority to exercise its discretion in considering development plans, "including the opportunity to grant any variances or waivers allowed by law."  Palazzolo v. Rhode Island, 533 U.S. 606, 620-21 (2001).  Once it becomes clear that the agency "lacks the discretion to permit any development, or [that] the permissible uses of the property are known to a reasonable degree of certainty," it is only then that a takings claim is likely ripe.  Id. at 620.

Here, Watson did submit a hardship application, but withheld facts which would truly permit the Commission to exercise its discretion on the matter.  On May 24, 2001, Watson filed its hardship application pursuant to the provisions of the moratorium ordinance.  The application was heard before the City Commission on June 25, 2006.  At the hearing, Watson's counsel, Patrice Boyes, repeatedly stated that the hearing

---

[11]  The complaint contains two paragraphs numbered as "204"; one appears on page 43 and the other on page 44.

was "an exercise in futility" because most of the exempting circumstances listed in the ordinance presupposed that the applicant already possessed a permit. *See* doc. 94, Tsp. App. 7 at 10:20, 15:11-14; 50:17-21; 61:16-20.

Boyes emphasized that she attended the hearing simply "to exhaust [Watson's] administrative remedies." *See* doc. 94, Tsp. App. 7 at 11:6-8; 62:3-4. Perhaps because Watson believed that applying for the hardship exemption would be futile, very little helpful information was provided by Watson to the Commission, and in fact, Boyes declined to respond to the baseline question of who actually owned the property at issue. *See* doc. 94, Tsp. App. 7 at 44:17-45:11. Although at least one commissioner believed at the beginning of the hearing that Watson had a good hardship case, the Commission as a whole voted to strike consideration of the application from that evening's agenda due to the lack of competent, substantial evidence. *See* doc. 94, Tsp. App. 7 at 8:14-16; 68:14-69:2; 69:20-25; 70:1-5; 70:17-20; 71:11-25; 82:16.

The ordinance does not prohibit resubmission of a hardship exemption application. Presumably the Commission would have considered and possibly granted the application once sufficient information had been provided to it. Because the Commission was not granted an opportunity to fully exercise its discretion on the matter, it could be argued that no final decision has yet been rendered.

However, even if striking the application from the agenda could be considered a final decision, Watson still has not exhausted its available state remedies, for reasons explained next.

***Exhaustion***

Florida now explicitly recognizes a state cause of action for inverse condemnation.  The Eleventh Circuit in New Port Largo, Inc. v. Monroe County, 985 F.2d 1488 (11th Cir. 1993), stated in a footnote that its prior panels, as well as Florida district court panels, disagreed as to whether Florida actually recognized a cause of action for damages wrought by regulatory takings.  Id. at 1494 n.12.  Since 1993, the year New Port Largo was decided, the Florida Supreme Court handed down its ruling in Rubano v. Dep't of Transp., 656 So. 2d 1264 (Fla. 1995), in which the court explicitly held, "[W]here a government agency, by its conduct or activities, has effectively taken private property without a formal exercise of the power of eminent domain, a cause of action for inverse condemnation will lie."  Id. at 1266.  See also Osceola County v. Best Diversified, Inc., 2005 WL 1787438 (Fla. 5th DCA 2005)(explaining elements of inverse condemnation as a cause of action).[12]

As is the case in Florida, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."  Williamson County, 473 U.S. at 195.  There is no indication in the record that Watson has pursued its inverse condemnation claims in state court.[13]

---

[12]  In 1995, the Florida Legislature enacted the Bert J. Harris, Jr., Private Property Rights Act, which was designed to provide a remedy "as a separate and distinct cause of action from the law of takings."  § 70.001, FLA. STAT. (1995).  See Russo Assocs, Inc. v. City of Dania Beach Code Enforcement Bd., 920 So. 2d 716, 717 (Fla. 4th DCA 2006)(noting that "the intention of section 70.001 is to provide an additional remedy when governmental action does not rise to the level of taking . . . .").  Plaintiff has not made any claims under this statute.

[13]  Watson's 2001 suit in state court seeking injunctive relief has no bearing on ripeness in the instant case.

Consequently, "[u]ntil [plaintiffs] pursue their state remedy, the federal courts are without subject matter jurisdiction."  Reahard v. Lee County, 30 F.3d 1412, 1418 (11th Cir. 1994).  This lack of jurisdiction compels entry of summary judgment on Counts VI and VII.


## COUNT V: INTENTIONAL INTERFERENCE

In Count V, Watson alleges that the City, by its actions, intentionally interfered with the purchase and sale contract between Watson and Yelvington by 1) passing the moratorium ordinance and 2) filing a "meritless interlocutory appeal . . . that was designed to frustrate the time constraints of the contract."  See doc. 1-2 at 41 ¶¶ 196-97.

At least one Florida court has recognized that intentional interference with a contract and intentional interference with a business relationship are "basically the same cause of action," the only distinction being whether an actual contract or simply a relationship exists.  Smith v. Ocean State Bank, 335 So. 2d 641, 642 (Fla. 1st DCA 1976).  The elements can be easily combined into one test for proving "interference with a business or contractual relationship," MD Assocs. v. Friedman, 556 So. 2d 1158, 1159 (Fla. 4th DCA 1990):

(1)     the existence of a business relationship, not necessarily evidenced by an enforceable contract;

(2)     knowledge of the relationship on the part of the defendant;

(3)     an intentional and unjustified interference with the relationship by the defendant; and

(4)     damages to the plaintiff as a result of the breach of the relationship.

Id. (citing Tamiami Trial Tours, Inc. v. Cotton, 463 So. 2d 1126 (Fla. 1985)).

Even an unenforceable contract can provide the basis for a finding of intentional interference "if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." Landry v. Hornstein, 462 So. 2d 844, 846 (Fla. 3d DCA 1985)(citations omitted).  However, a mere offer to sell, without more, is insufficient.  Id.  (citing Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc., 361 So. 2d 769 (Fla. 4th DCA 1978).

Here, Watson and Yelvington entered into a "Purchase and Sale Agreement" in March of 2000[14] in which Watson paid Yelvington $10,000 as a deposit on the total $400,000 purchase price.  See doc. 95, App. Exh. 5 at 1.  The agreement provided that the sale was contingent upon Watson's ability to secure site plan approval for its intended use of the property.  Both Watson and Yelvington signed the contract, as well as Coolidge Davis, a real estate agent acting as a broker for the transaction.

The fact that both Watson and Yelvington signed the agreement in this case demonstrates more than a "mere offer to sell." MD Assocs. v. Friedman, 556 So. 2d 1158, 1159 (Fla. 4th DCA 1990).  Watson had paid $10,000 as a deposit on the property, thus vesting it with certain expectations.  The City was aware of the agreement between Watson and Yelvington.  The question is whether the City can be said to have "intentionally and unjustifiably" interfered with that agreement.  Watson

---

[14]   The first page of the agreement bears a date of January 12, 2000, but the signatures were not executed until March 5 or 6.  See doc. 95, App. Exh 5 at 4.

suggests that the City interfered by enacting the moratorium and by filing a "meritless" interlocutory appeal.

As noted elsewhere in this order, the City's enactment of the moratorium bore a rational relationship to further its stated goals of protecting the health and safety of its citizens.  Further, caselaw holds that moratoria are important planning tools which satisfy legitimate governmental purposes.  Thus, it cannot be said that the City's imposition of the moratorium intentionally and unjustifiably interfered with the purchase and sale agreement between Watson and Yelvington.

The same rationale applies to the interlocutory appeal taken by the City from the state circuit court's granting of the temporary injunction.  The First District Court of Appeal of Florida found that the trial court did not abuse its discretion in issuing the injunction, but did agree with the City's contention that the injunction failed to address the issue of posting bond.  *See* doc. 98, att. 13, App. Exh. 510 at 3.  The lack of a bond requirement renders the injunction defective.  Id.  The appellate court did not find the appeal to be frivolous, and this Court reaches the same conclusion.

That the City's actions pass the rational basis test and are not frivolous does not lessen the impression that there certainly does seem to be some hostility on the City's part toward the Watson project.  Perhaps the most striking evidence of this hostility comes from an e-mail written by the City planner regarding the February 12 "zoning-in-progress" cutoff date, in which she states: "The key thing with the moratorium is that the implementation date would remain Feb. 12, thereby catching the asphalt plant before their submittal."  *See* doc. 175, App. Ex. 437 at 1.  Apparently, this and other similar

conduct was enough to raise concern with some of the commissioners themselves, who

expressed concern that Watson was being either targeted or affected unfairly.  *See*

doc. 94, Tsp. App. 4 at 235:4-10 (HANRAHAN:  "So it frankly isn't necessarily an outcome

that I feel real comfortable with in terms of necessity–I just think it would probably be an

unfair thing to do to try and catch that particular site under this moratorium"); doc. 94,

Tsp. App. 5 at 98:5-8 (MAYOR: "I still feel that we ought to review a little more this date.

I have concerns about it.  I do feel like one business is being specifically affected . . . .").

Other commissioners were very careful to emphasize that they were not targeting

Watson by their choice of cutoff date, stating that they were simply relying upon the City

Attorney's professional legal opinion as to the proper date to be used.  *See* doc. 94,

Tsp. App. 4 at 195:11-12; 212:15-21; doc. 94, Tsp. App. 5 at 88:3-5.

      However, hostility, malevolence, or unconstitutional motive on the part of one or

two (or even more) commission members does not render the City liable.  "An

unconstitutional motive on the part of one member . . . is insufficient to impute an

unconstitutional motive to the Commission as a whole."  Matthews v. Columbia City,

294 F.3d 1294, 1297 (11th Cir. 2002)(*citing* Mason v. Village of El Portal, 240 F.3d

1337, 1339 (11th Cir. 2001) *and* Church v. City of Huntsville, 30 F.3d 1332, 1343 (11th

Cir. 1994)).  Because Watson has not shown that the Commission as an entity acted

with unconstitutional motive, summary judgment must be granted as to Count V.

Accordingly, it is

      **ORDERED AND ADJUDGED** as follows:

      1.     Defendant's countermotion for summary judgment (doc. 103) is hereby

*granted*.

2.    Plaintiff's motion to strike affirmative defenses, motion for summary

judgment, and motion for attorney fees (doc. 60) is hereby *denied*.

3.    Plaintiff's motion for partial summary judgment (doc. 119) is hereby

*denied*.

4.    The clerk is directed to enter summary judgment in favor of Defendant on

all counts.

5.    All other pending motions are *dismissed* as moot.

**DONE AND ORDERED** this <u>twenty-third</u> day of May, 2006.

<u>  *s/ Stephan P. Mickle*          </u>
Stephan P. Mickle
United States District Judge